**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**CHRISTOPHER S. JONES,**

        **Plaintiff,**

                                      **Civil Action 2:18-cv-00455**
                                      **Judge George C. Smith**
      **v.**                                    **Chief Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF SOCIAL SECURITY,**

        **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Christopher S. Jones ("Plaintiff"), brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Social Security Disability Insurance benefits ("SSDI"). This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 9), the Commissioner's Memorandum in Opposition (ECF No. 14), Plaintiff's Reply (ECF No. 17), and the administrative record (ECF No. 6). For the following reasons, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## I.  BACKGROUND

Plaintiff applied for disability benefits on December 30, 2014. (R. at 15.) Plaintiff's claim was denied initially and upon reconsideration. (*Id.*) Upon request, a hearing was held on April 10, 2017, in which Plaintiff, represented by counsel, appeared and testified. (R. at 109–53.) A vocational expert and a medical expert also appeared and testified at the hearing. (R. at

136–52.)  On July 5, 2017, Administrative Law Judge Jason C. Earnhart ("the ALJ") issued a decision finding that Plaintiff was not disabled at any time from August 31, 2008, the alleged onset date, through June 30, 2014, the date last insured.  (R. at 12–34.)  On March 12, 2018, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision.  (R. at 1–6.)  Plaintiff then timely commenced the instant action. (ECF No. 1.)

## II.  RELEVANT HEARING TESTIMONY

### A.  Plaintiff's Testimony

Plaintiff testified at the April 2017 hearing that his last job was seasonal pool attendant work for the last three summers, starting on Memorial Day and ending on Labor Day.  (R. at 115–16.)  Plaintiff further testified that as a pool attendant it was his job to observe the pool and "to make sure nobody trashes it [or] brings in glass or alcohol."  (R. at 116.)  Plaintiff stated it was not a lifeguard position.  (*Id.*)  Plaintiff further stated that automation was "driving [him] out of that job."  (*Id.*)  Plaintiff testified that he previously worked for Liebert North America as a marketing specialist.  (R. at 117–18.)  Plaintiff stated that Liebert North America "eliminated the position" and that he "was having a tough time completing the requirements of the position at the time, due to fibromyalgia symptoms."  (R. at 118.)  Plaintiff also stated that prior to that position he worked at Rite Rug Company in sales.  (R. at 118–19.)  Before that, Plaintiff testified he worked at the Gap in the customer relations call center.  (R. at 120.)  Plaintiff also testified that before the Gap he worked at WorldCom as an integration specialist, and before that he was in international marketing.  (R. at 121.)

Plaintiff testified that he stopped working in 2008 because he was "very depressed" about his fibromyalgia symptoms and he was "hurting a lot because of the fibromyalgia pain and the

chronic fatigue that became very symptomatic." (R. at 122.) He further testified that he "just

didn't feel like [he] was able to go back to work." (*Id.*) Plaintiff stated he still has problems

with fibromyalgia, chronic fatigue, and depression. (*Id.*) He further stated that the "profound

fatigue" is one of his primary problems with fibromyalgia, along with chronic pain and cognitive

impairment. (*Id.*) Plaintiff testified that doctors have told him he has about fifteen of the "tender

points" related to fibromyalgia. (R. at 123.) Plaintiff stated he takes Gabapentin daily and that it

"helps somewhat with the pain" but that it worsens his "mental fog." (R. at 124.) He further

stated that his fibromyalgia does "a lot better in the summer, when it's warm, and [he is] in the

sun." (R. at 129.)

## B. Medical Expert Testimony

Mary E. Buban, M.D.,[1] a psychologist, testified as the medical expert ("ME") at the April

2017 hearing. (R. at 136–45.) When discussing the opinion from Gina Sansotta, J.D., Psy.D.,

Dr. Buban indicated that Dr. Sansotta, who had three appointments with Plaintiff, had filled out a

form on July 20, 2016 but "it wasn't clear" to Dr. Buban "because it had marked through – it

said, Cannot comment. And then it said, Error. And then it said, This is per patient report." (R.

at 137.) Dr. Buban testified that she "really didn't know what to make of [Dr. Sansotta's] form."

(*Id.*) Dr. Buban further testified that Dr. Sansotta indicated depression, anxiety, substance abuse,

OCD, and sleep problems. (*Id.*)

Regarding the record evidence about Plaintiff's concentration, persistence, and pace, Dr.

Buban testified that Dr. Johansen had opined that Plaintiff had

> extreme limitations for working at a consistent pace; attention, concentration;
> production levels. And then once again, refers to – described fibromyalgia, creating
> worse stress and sleep. These extreme limitations don't make any sense, in terms

---

[1] The Hearing Testimony transcript incorrectly refers to Dr. Buban as "Dr. Bruden." (R. at 109–
53.)

of the entire record.  And also, the Claimant's presentation today, which does not support extreme limitations.  I did review [Exhibit] 3A, as well, and – and then I'm inclined to agree with the PDF, that there would be a moderate limitation for concentration, persistence, and pace.  And that would be the primary difficulty, in – terms of psychological/psychiatric perspectives.

(R. at 139.)  Furthermore, Dr. Buban opined that she does "not see" Plaintiff's psychological impairments meeting or equaling a listing.  (R. at 139, 142.)  She testified that she thinks he has "got what would be described best as a 12.04 . . . depressive disorder."  (R. at 139.)  She further testified that in terms of B criteria, Plaintiff's understanding, remembering, and applying information is "probably impaired"; interacting with others is "moderately impaired"; concentration, persistence, and maintaining pace is "moderately impaired"; and adapting and management is "mildly impaired."  (R. at 140.)

When asked whether the record supported or indicated a diagnosis of personality disorder for Plaintiff, Dr. Buban testified that "[t]here are some [exhibits] that talk about – there's some mention in the record of personality traits, yes."  (R. at 145.)  When asked whether there was enough to identify personality disorder as an impairment, Dr. Buban testified that "the main treatment does not –the problem with the record –it's mostly forms.  There [are] not a of [sic] statements.  And the 2013 is the most comprehensive treatment, and that was not included in those records as a primary diagnosis."  (*Id.*)

### C. Vocational Expert Testimony

Michael Klein testified as the vocational expert ("VE") at the April 2017 hearing.  (R. at 146–52.)  The ALJ asked the VE to assume a hypothetical individual with the same age, education, and experience as Plaintiff who can work at all exertional levels; who can frequently climb ramps and stairs, balance, stoop, kneel, crouch, crawl, push and pull with the bilateral upper extremities, do handling, and do fingering; who can never climb ladders, ropes, or

scaffolds, or be near hazards such as dangerous machinery, unprotected heights, or commercial

driving; who is limited to simple, routine tasks with no fast production pace and no tandem tasks;

who can have occasional public interaction and occasional changes in the work setting.  (R. at

147.)

Assuming those limitations, the VE testified that the hypothetical individual could not

perform any of Plaintiff's past work.  (*Id.*)  The VE, however, testified that the hypothetical

individual could perform other jobs such as cleaner, laborer, marker, lens inserter, and

surveillance system monitor.  (R. at 148–49.)  The VE further testified that if the hypothetical

individual could only occasionally balance, stoop, kneel, crouch, or crawl this would not change

his answers.  (R. at 149.)  The VE also testified that if occasional interaction with co-workers and

supervisors was added, this would not change his answers.  (R. at 150.)

When asked if an individual with the same age, education, and background of Plaintiff

who would, at least twenty-five percent of the work day or work week, have problems in

maintaining attention and concentration for more than brief periods of time, with the same

impairment in performing at production levels expected by most employers, the VE testified that

hypothetical individual would be precluded from work.  (R. at 152.)

## III.   RELEVANT MEDICAL RECORDS

### A.  Gina A. Sansotta, J.D., Psy.D.

Plaintiff presented for his initial psychological assessment with Dr. Sansotta on

December 20, 2010.  (R. at 362–76.)  Plaintiff reported that at that time he was self-employed as

an "art dealer" and "home rehabber."  (R. at 364.)  When discussing his mental health habits,

Plaintiff reported that for physical exercise he worked on his house on average three to five times

a week and did yoga on average once a week.  (R. at 368.)  Plaintiff was noted to cancel several

appointments after his initial assessment, not returning until March 29, 2011. (R. at 358.) He reported personality testing was performed by another doctor in the interim and that his unemployment was running out soon. (R. at 358–59.) Plaintiff continued seeing Dr. Sansotta through August 20, 2012. (R. at 336–59.) During his treatment, Dr. Sansotta changed her diagnosis from adjustment disorder with depression to major depressive disorder. (*Id.*)

Dr. Sansotta completed a Medical Source Statement as to Ability to Perform Work Related Activities (Mental) regarding Plaintiff on July 20, 2016. (R. at 552–54.) Notably, the first two pages of the Medical Source Statement have a line crossed through them and a handwritten note that says "I will comment by history. G.S." (R. at 552–53.) A handwritten note on the final page of the Medical Source Statement under "estimated impairment of ability to tolerate customary work pressures," which Dr. Sansotta marked as "extreme," reads "per patient report." (R. at 554.)

Dr. Sansotta also prepared a narrative opinion regarding the "Diagnoses" section on the Medical Source Statement. (R. at 557–59.) She reported she was not currently seeing Plaintiff as a patient but saw him for psychotherapy in 2011 and 2012. (R. at 557.) She further reported "I cannot comment on anything that has transpired with [Plaintiff] since. Nor can I render any opinion about current fitness for work. I am providing this per release of information executed by [Plaintiff] on April 18, 2016. I am using a review of my extensive clinical notes and my own recollections to write this report." (*Id.*) Dr. Sansotta indicated that Plaintiff presented with the following diagnoses during the time she saw him:

- History of depression since childhood

- History of Anxiety and Obsessive-Compulsive Disorders since childhood

- History of Substance Abuse, primarily alcohol and cigarettes, beginning in the teenage years

- Several elements of several personality disorders emerging probably in teenage years and becoming much more prominent in adult life

(*Id.*) She goes on to note that Plaintiff's "compulsive OCD combined with his Personality Disorders made it very difficult for [him] to succeed in the world of work." (R. at 558.)

Specifically, regarding her notes about personality disorders, Dr. Sansotta opined:

> I want to speak to the personality styles/disorders which [Plaintiff] displayed while working with me. I am not going into detail of every disorder but review salient observations. I observations [sic] of the following: Narcissism, Borderline Personality, Anti-Social. I want to clarify that Anti-social does not mean not liking people. It means doing things against the norms of society. In here I place his use of drugs and alcohol, putting himself and others at risk. [Plaintiff] chinks [sic] primarily of himself of himself [sic] and gets angry and petulant when he does not get his own way. He pouts. He always has an argument why the other person is wrong. He just has to be right. He does this to protect his feelings of self-loathing and low self-esteem. He is married, but every time I asked about his marriage he had very little to say, and would never bring her in. Finally, he shows traits of borderline personality: frantic attempts to avoid abandonment, [o]verindulgence in an activity, severe problems in relations.
>
> In conclusion, all the above combine, making it extremely difficult for [Plaintiff] to work. He simply does not have the capacity to interact with people in a normal or productive way. His mental illness keeps him from this.

(R. at 558–59.)

### B. Concentration, Persistence, and Pace

On June 10, 2015, Joseph Edwards, Ph.D., a State agency psychologist, opined that Plaintiff had the following limitations in Sustained Concentration and Persistence:

- The ability to carry out very short and simple instructions = not significantly limited

- The ability to carry out detailed instructions = not significantly limited

- The ability to maintain attention and concentration for extended periods = moderately limited

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual with customary tolerances = not significantly limited

- The ability to sustain an ordinary routine without special supervision = not significantly limited

- The ability to work in coordination with or in proximity to others without being distracted by them = not significantly limited

- The ability to make simple work-related decisions = not significantly limited

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods = moderately limited

- Explain in narrative form the sustained concentration and persistence capacities and/or limitations: "The claimant would have been able to perform a wide array of short cycle tasks in an environment with at most moderate pace demands. Claimant has the ability to attend and concentration for periods of tow [sic] hours."

(R. at 178–79.)

Michael Johansen, M.D., Plaintiff's treating physician, completed a Medical Source Statement as to Ability to Perform Work Related Activities (Mental) regarding Plaintiff on March 31, 2016. (R. at 543–45.) Dr. Johansen opined that Plaintiff had the following impairments in Sustained Concentration and Persistence:

- Estimated impairment of ability to perform and complete work tasks in a normal work day or work week at a consistent pace = extreme

- Estimated impairment of ability to work in cooperation with or in proximity to others without being distracted by them = mild

- Estimated impairment of ability to process subjective information accurately and to use appropriate judgment = moderate

- Estimated impairment of ability to carry through instructions and complete tasks independently = mild

- Estimated impairment of ability to maintain attention and concentration for more than brief periods of time = extreme

- Estimated impairment of ability to perform at production levels expected by most employers = extreme

(R. at 544.)

Kevin V. Hackshaw, M.D., completed a Medical Source Statement regarding Plaintiff on July 28, 2016.  (R. at 562–64.)  Dr. Hackshaw opined that Plaintiff had the following impairments in Sustained Concentration and Persistence:

- Estimated impairment of ability to perform and complete work tasks in a normal work day or work week at a consistent pace = mild

- Estimated impairment of ability to work in cooperation with or in proximity to others without being distracted by them = moderate

- Estimated impairment of ability to process subjective information accurately and to use appropriate judgment = mild

- Estimated impairment of ability to carry through instructions and complete tasks independently = mild

- Estimated impairment of ability to maintain attention and concentration for more than brief periods of time = moderate

- Estimated impairment of ability to perform at production levels expected by most employers = moderate

(R. at 563.)

### C. Fibromyalgia

Maryjo P. Welker, M.D., Plaintiff's treating physician, indicated on January 9, 2015, that Plaintiff had decided that "he has chronic fatigue syndrome and is interested in a possible referral for that." (R. at 529.) Dr. Welker also indicated that Plaintiff identifies chronic fatigue syndrome with fibromyalgia and gave him a referral to rheumatology, noting "Fibromyalgia – Rheumatology" under "Diagnoses and associated orders for this visit." (R. at 529–30.) On February 9, 2015, Plaintiff saw Dr. Johansen who indicated that he doubted Plaintiff's fibromyalgia diagnosis and noted that Plaintiff's diagnosis "seems more consistent with systemic exertion intolerance disease." (R. at 662–64.) Nonetheless, Dr. Johansen continued Plaintiff on Gabapentin and recommended cognitive behavioral therapy and low level exercise. (R. at 664.)

Plaintiff saw Dr. Hackshaw on March 4, 2015. (R. at 689.) Plaintiff reported that his symptoms had worsened since they initially started, but Dr. Hackshaw noted that Plaintiff had no associated neurologic, cardiac, or gastrointestinal symptoms. (*Id.*) Plaintiff reported to Dr. Hackshaw that he was diagnosed with fibromyalgia by Dr. Marc Antonchek at "Col Arth Center." (*Id.*) Dr. Hackshaw noted that Plaintiff's heart rate and rhythm were regular, there was no swelling of joints, his range of motion in his upper and lower extremities was normal, but that "[p]ainful tender points were elicited in greater than 11 of 18 sites with mild hyperalgesia." (R. at 690.) Dr. Hackshaw further noted that Plaintiff "does meet hypersensitivity criteria in terms

of painful tender points to classify as [fibromyalgia] however there are also some mental health issues that play a part in his picture." (R. at 692.)

At a September 24, 2015 visit, Dr. Johansen noted that Plaintiff's chronic fatigue/fibromyalgia had "stable symptoms." (R. at 651–53.) Plaintiff saw Dr. Johansen again on March 31, 2016, and Dr. Johansen noted that, regarding Plaintiff's fibromyalgia, he had filled out the disability paperwork. (R. at 650.) Dr. Johansen further noted that Plaintiff was unlikely to be able to work consistently given the severity of symptoms and that he discussed the lack of evidence to support use of Topiramate with Plaintiff. (*Id.*) Dr. Johansen also completed a medical source statement on March 31, 2016, and he indicated that his assessment was premised upon his diagnosis of fibromyalgia, chronic fatigue syndrome, and tension headaches. (R. at 540–42.)

## IV. ADMINISTRATIVE DECISION

On July 5, 2017, the ALJ issued his decision. (R. at 12–34.) At step one of the sequential evaluation process,[2] the ALJ found that Plaintiff had not engaged in substantial

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. §416.920(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

gainful activity during the period from his alleged onset date of August 31, 2008, through his

date last insured of June 30, 2014. (R. at 18.) The ALJ found that Plaintiff has the following

severe impairments: fibromyalgia, obstructive sleep apnea with hypersomnia, and affective and

anxiety disorders. (*Id.*) The ALJ further found that Plaintiff did not have an impairment or

combination of impairments that meets or medically equals the severity of one of the listed

impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 19.)

At step four of the sequential process, the ALJ set forth Plaintiff's residual functional

capacity ("RFC") as follows:

> [Plaintiff] had the residual functional capacity to perform medium work as defined
> in 20 CFR 404.1567(c) except frequent climbing of ramps and stairs; frequent
> balancing, stooping, kneeling, crouching or crawling; frequent pushing and pulling
> with the bilateral upper extremities; frequent handling and fingering with the
> bilateral upper extremities; no climbing of ladders, ropes, and scaffolds or work
> around hazards such as dangerous machinery or unprotected heights, no
> commercial driving; capable of simple routine tasks with no fast production pace
> and no tandem tasks, occasional public interaction, and occasional changes in the
> workplace.

(R. at 21.)

In reaching his conclusions regarding Plaintiff's RFC, the ALJ relied on the opinion from

the medical expert, Dr. Buban, determining that she had the benefit of reviewing most of the

record, as well as considering the other opinion evidence. (R. at 32.) The ALJ gave "some

weight" to the opinions from the state agency medical consultants. (*Id.*) The ALJ gave "little

weight" to the opinion from Dr. Sansotta as "it is on an issue reserved to the Commissioner,

unsupported by the remote notes, and inconsistent with other treatment." (R. at 31.) The ALJ

assigned "little weight" to Dr. Johansen's opinion because the restrictions purportedly related

---

See 20 C.F.R. §416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster
v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

back to August 1, 2011, which is inconsistent with Dr. Johansen not treating Plaintiff until February of 2015, and with Plaintiff's actual treatment records involving the lack of significant reported fibromyalgia symptomology until January of 2015, normal mental status exam findings with regard to these areas, and Dr. Johansen's own notes of improved fibromyalgia once treatment was initiated. (R. at 26.) The ALJ found Dr. Hackshaw's opinion is on an issue reserved to the Commissioner as well as unsupported by objective findings during exams and his treatment history. (R. at 28.)

Relying on testimony from the VE, the ALJ concluded that through the date last insured, Plaintiff was unable to perform any past relevant work. (R. at 33.) The ALJ found that, through the date last insured, considering Plaintiff's age, education, work experience, and RFC, there were jobs that exist in significant numbers in the national economy that Plaintiff could have performed. (*Id.*) He therefore concluded that Plaintiff was not disabled under the Social Security Act from August 31, 2008, the alleged onset date, through June 30, 2014, the date last insured. (R. at 34.)

## V. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the [Social Security Administration] fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI.    ANALYSIS

Plaintiff puts forth three assignments of error. First, Plaintiff asserts that the RFC determination is not supported by substantial evidence. (ECF No. 9, at pg. 6–12.) Second, Plaintiff asserts that the ALJ erred in his analysis of his fibromyalgia, pursuant to SSR 12-2P. (*Id.* at 12–17.) Third, Plaintiff asserts that the ALJ failed to recognize and consider his personality disorder as a medically determinable impairment. (*Id.* at 17–19.) The Undersigned addresses each argument in turn.

## A. RFC Determination

In his first assignment of error, Plaintiff argues that the RFC determination is not supported by substantial evidence because the ALJ erred in according more weight to Dr. Buban's opinion and the RFC does not adequately account for Plaintiff's limitations in concentration, persistence, or pace. (*Id.* at 7, 9.)

A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a). The determination of RFC is an issue reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e), 416.927(e). Nevertheless, substantial evidence must support the Commissioner's RFC finding. *Berry v. Astrue*, No. 1:09CV000411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010). When considering the medical evidence and calculating the RFC, "'ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.'" *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009) (quoting *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)); *see also Isaacs v. Astrue*, No. 1:08–CV–00828, 2009 WL 3672060, at *10 (S.D. Ohio Nov. 4, 2009) (holding that an "ALJ may not interpret raw medical data in functional terms") (internal quotations omitted).

An ALJ is required to explain how the evidence supports the limitations that he set forth in the claimant's RFC:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must

also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

S.S.R. 96–8p, 1996 WL 374184, at *6–7 (internal footnote omitted).

Plaintiff asserts that the ALJ's RFC determination is not supported by substantial evidence. Specifically, Plaintiff first asserts that the ALJ erred in according "more weight" to Dr. Buban, the testifying medical expert. (ECF No. 9, at pg. 7–9.) He maintains that Dr. Buban did not review all of the evidence of record, particularly with respect to his diagnosis of personality disorders. (*Id.*) When asked whether the record supported or indicated a diagnosis of personality disorder for Plaintiff, Dr. Buban testified that "[t]here are some [exhibits] that talk about – there's some mention in the record of personality traits, yes." (R. at 145.) When asked whether there was enough to identify personality disorder as an impairment, Dr. Buban testified that "the main treatment does not –the problem with the record –it's mostly forms. There [are] not a of [sic] statements. And the 2013 is the most comprehensive treatment, and that was not included in those records as a primary diagnosis." (*Id.*) Plaintiff asserts that based on these responses "it is clear that [Dr. Buban] did not review the opinion provided by Gina Sansotta, J.D., Psy.D."[3] (ECF No. 9, at pg. 8.) Furthermore, Plaintiff asserts that "Dr. Buban's failure to acknowledge [Plaintiff's] personality disorders is an error and the ALJ should not have relied on Dr. Buban's incomplete review of the record or her incomplete analysis." (*Id.*)

The ALJ was entitled to rely on Dr. Buban's testimony because she gave a reasoned explanation for why the record did not support a finding that personality disorder was a separate impairment. At the hearing, Plaintiff's counsel specifically asked Dr. Buban whether the record

---

[3] Though later Plaintiff notes that "[i]t is unclear if [Dr. Buban] did not recall [Dr. Sansotta's] opinion or had reviewed the opinion but failed to recognize [Dr. Sansotta's] diagnosis of personality disorders." (ECF No. 9, at pg. 8.)

supported a diagnosis for a personality disorder. Dr. Buban acknowledged that "there's some mention in the record of personality traits," but explained that the comprehensive mental health treatment from 2013 did not include personality disorder as a diagnosis. (R. at 145.) Indeed, Plaintiff's 2013 treatment notes demonstrate that Plaintiff was consistently diagnosed with depression and post-traumatic stress disorder, not a personality disorder. (R. at 386, 388, 390, 391, 394). During a follow-up in December 2013, Plaintiff was diagnosed with major depressive disorder and generalized anxiety disorder, not a personality disorder. (R. at 425.) It was therefore entirely reasonable for the ALJ to rely on Dr. Buban's assessment that Plaintiff did not have a personality disorder.

Nevertheless, Plaintiff contends that Dr. Buban must not have reviewed the opinion provided by Dr. Sansotta. But as the Commissioner points out, there is no material discrepancy between Dr. Buban's testimony and Dr. Sansotta's letter. Dr. Sansotta indicated that Plaintiff displayed "several elements of several personality disorders" and "traits of borderline personality." (R. at 557–59.) She represented that she had "observations" of "personality styles/disorders." (R. at 558.) Dr. Buban acknowledged that "there is some mention in the record of personality traits." (R. at 145.) Importantly, Dr. Sansotta never diagnosed a personality disorder while treating Plaintiff. When she first examined Plaintiff, she diagnosed him with an adjustment disorder, anxiety/depression, and polysubstance abuse. (R. at 340–89.) She did not diagnose a personality disorder and did not alter her diagnoses to include a personality disorder over the course of treatment between 2010 and 2012. (*Id.*)

To the extent Plaintiff challenges the weight the ALJ assigned to Dr. Buban's testimony over the opinions of Dr. Sansotta, that argument fails. Dr. Sansotta was a treating source for Plaintiff. (*See* R. at 336–59, 362–76.) The ALJ generally gives deference to the opinions of a

treating source "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical filings alone . . . ." 20 C.F.R. § 416.927(c)(2); *Blakley*, 581 F.3d at 408. If the treating source's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the [claimant's] case record, [the ALJ] will give it controlling weight." 20 C.F.R. § 404.1527(c)(2).

If the ALJ does not afford controlling weight to a treating source's opinion, the ALJ must meet certain procedural requirements. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

*Id.*

Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion." 20 C.F.R. § 416.927(c)(2). Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. 2010) (internal quotation omitted). The United States Court of Appeals for the Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some

> reason for the agency's decision is supplied." *Snell v. Apfel*, 177 f.3d 128, 134 (2d
> Cir. 1999). The requirement also ensures that the ALJ applies the treating physician
> rule and permits meaningful review of the ALJ's application of the rule. *See*
> *Halloran v. Barnhart*, 362 F.3d 28, 32-33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544-45. Thus, the reason-giving requirement is "particularly important when

the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v. Comm'r of*

*Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242). There is no

requirement, however, that the ALJ "expressly" consider each of the *Wilson* factors within the

written decision. *See Tilley v. Comm'r of Soc. Sec.*, 394 F. App'x 216, 222 (6th Cir. 2010).

Finally, the Commissioner reserves the power to decide certain issues, such as a

claimant's residual functional capacity. 20 C.F.R. § 404.1527(d). Although the ALJ will

consider opinions of treating sources "on the nature and severity of your impairment(s),"

opinions on issues reserved to the Commissioner are generally not entitled to special

significance. 20 C.F.R. § 404.1527(d); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

Here, the ALJ made the following assessment regarding Dr. Sansotta's opinion:

> [Plaintiff] presented to a psychologist, Dr. Sansotta, at the Center for Cognitive and
> Behavioral Therapy on December 20, 2010 with treatment for adjustment disorder
> with anxiety and depression and polysubstance dependence through August 20,
> 2012 (Exhibit 1F). . . .
>
> [Dr. Sansotta was a] former treating doctor [who] completed a medical source
> questionnaire dated July 20, 2016, nearly four years after the end of treatment
> (Exhibit 11F). This is the medical source statement discussed by the medical expert
> at the hearing, who noted many cross outs and remarks involving the inability to
> comment, such that the medical expert opined that she did not what [sic] to make
> of it. The undersigned gives this opinion little weight for these reasons and others.
> The extreme limitation in tolerating customary work pressures was marked extreme
> but "per patient report." Although the doctor checked that [Plaintiff's] condition
> would likely deteriorate, there was a note indicating an inability to comment on the
> current ability. She had admitted to no treatment of [Plaintiff] in nearly four years.
> Thus, [Dr. Sansotta] was opining as to her recollection with reference to her brief
> session notes as to [Plaintiff's] abilities and limitations many years in the past.
> Moderate limitation was checked with [Dr. Sansotta] again noting her inability to
> comment other than during his unemployment from 2010-2012. Moderate to

marked limitation in dealing with others was suggested, which is unsupported by the record according to the testimony of [Dr. Buban, the medical expert,] at the hearing, which is consistent with the record. As also noted by the medical expert, the limitations indicated by [Dr. Sansotta], many moderate and some marked, do not match the definitions of the terms for purposes of social security disability. By the form, "moderate" limitation would preclude functioning in the area from 11%-25% of the workday or week. There was an accompanying letter which largely consisted of [Plaintiff's] self-reports, with some clinical notations partially on memory and partially on review of these remote treatment notes. [Dr. Sansotta] opined that [Plaintiff's] impairments would make it extremely difficult for [Plaintiff] to work as he did not have the capacity to interact with people in a normal or productive way. This opinion is given little weight as it is on an issue reserved to the Commissioner, unsupported by the remote notes, and inconsistent with other treatment records. Although [Dr. Sansotta] noted some personality traits, she indicated that she had changed her diagnosis from adjustment disorder with depression to major depressive disorder and that this diagnosis remained throughout treatment. Although the doctor remarked that [Plaintiff] choose [sic] not to take medications due to lack of success in the past, subsequent records indicate [Plaintiff's] report of improvement with medications in 2013. Furthermore, [Plaintiff's] presentation and objective mental exam findings at many examination[s] during the period up to his date last insured do not support the limitations suggested by [Dr. Sansotta] four years to six years after her treatment. This is consistent with the opinion of [Dr. Buban] and the State agency psychological consultants who had the benefit of more treatment records to review and other evidence of functioning during the entire period of alleged disability.

(R. at 31–32.)

"Where the opinion of a treating physician is not supported by objective evidence or is inconsistent with the other medical evidence in the record, this Court generally will uphold an ALJ's decision to discount that opinion." *Price v. Comm'r of Soc. Sec.*, 342 F. App'x 172, 175–76 (6th Cir. 2009) (citations omitted). Here, substantial evidence supports the ALJ's conclusion that Dr. Buban's opinion was supported by the record, whereas Dr. Sansotta's opinion was not. Dr. Sansotta's opinion is inconsistent with the record, based on Plaintiff's self-reports, and was rendered remote in time to her actual observations.

Plaintiff also argues that the ALJ's RFC determination "does not adequately account for Plaintiff's limitations in concentration, persistence, or pace." (ECF No. 9, at pg. 9.)

Specifically, Plaintiff asserts that the RFC does not fully address Plaintiff's limitations in this area and that the ALJ improperly accorded "more weight" to the opinion of Dr. Buban on Plaintiff's limitations in concentration, persistence, and pace. (*Id.*) Furthermore, Plaintiff takes issue with the hypothetical question presented to the VE, asserting that it "is not adequate on the issues of concentration, persistence and pace for this Court to have any idea as to the number of jobs identified by the vocational expert that would be excluded if the claimant required repetition of directions, only visual demonstration directions, or other aspects related to moderate concentration limitations were added to the hypothetical question." (*Id.* at 11.)

Plaintiff points to the testimony of Dr. Buban, and findings by Dr. Johansen, Dr. Hackshaw, and Dr. Edwards. (*Id.* at 9–11.) Dr. Buban's testimony and the findings of the doctors regarding concentration, persistence, and pace are outlined above. Notably, Dr. Johansen and Dr. Hackshaw's opinions were recorded less than four months apart but vary considerably. (R. at 544, 563.) While Dr. Johansen, for example, finds that Plaintiff has extreme limitations in his ability to perform and complete work tasks in a normal work day or work week at a consistent pace, Dr. Hackshaw finds only mild limitations in this area. (*Id.*) Additionally, Dr. Johansen finds that Plaintiff has extreme limitations in his ability to maintain attention and concentration for more than brief periods of time, while Dr. Hackshaw finds only moderate limitations in this area. (*Id.*) Moreover, Dr. Johansen and Dr. Hackshaw's opinions were given approximately two years after Plaintiff's date last insured. (*Id.*)

The determination of a plaintiff's RFC is entirely within the purview of the ALJ, and "this Court will defer to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). Here, the ALJ did not ignore Plaintiff's difficulties with concentration,

persistence, or pace.  In his RFC determination, the ALJ specifically noted that Plaintiff was

"capable of simple routine tasks with no fast production pace and no tandem tasks."  (R. at 21.)

Furthermore, the ALJ carefully considered the evidence in the record regarding Plaintiff's

limitations in concentration, persistence, and pace.  The ALJ indicated the following:

> Another medical source statement by Dr. Hackshaw was discussed [with Dr. Buban] with the form's definitions of limitations significantly differing from those used to evaluate disability (Exhibit 12F).  [Dr. Buban] then discussed the opinion of [Plaintiff's] physician, Dr. Johansen, at Exhibit 9F.  Dr. Buban opined that the extreme limitations the doctor indicated do not make any sense in terms of the entire record and [Plaintiff's] presentation and his testimony at the hearing.  After considering all the opinion evidence and exhibited treatment records, [Dr. Buban] opined that she agreed with the State agency psychological consultants who found a moderate limitation in concentration, persistence or pace, which would be the primary difficulty from a psychological standpoint. . . . [Dr. Buban] opined that [Plaintiff] was capable of simple routine repetitive tasks without a lot of changes and only occasional interaction with public with no team work required.  This opinion is given some weight[.]
>
> . . .
>
> At his March 23, 2015 follow-up, it was reported that [Plaintiff] returned with a list of labs he would like to have ordered after his negative rheumatology testing.  On June 25, 2015, [Plaintiff] report[ed] bicycle commuting to work.  Dr. Johansen noted that [Plaintiff's] symptoms were less apparent with lifestyle changes and weight loss (Exhibit 18F/21).  Accordingly to this doctor, [Plaintiff] was doing well, had stable symptoms, and was advised to get a job at his September 24, 2015 follow-up.  His chronic fatigue/fibromyalgia was deemed stable (Exhibit 18F/17).
>
> Despite the previous advice to get a job, improved and stable symptoms with normal mental status findings, [Dr. Johansen] filled out the requested disability paperwork at [Plaintiff's] next visit on March 31, 2016.  It was noted that [Plaintiff] was seen for fibromyalgia, fatigue and paperwork, with chronic fatigue to be investigated.  The doctor added the diagnosis of alcohol abuse, with [Plaintiff] to continue his AA meetings.  [Plaintiff] was noted to report that he had filed for disability and that his fibromyalgia symptoms were quite bothersome with upper back and neck pain, problematic sleep, and profound fatigue, and that he was also seeing other doctors.  All objective findings were normal with [Plaintiff] described as well appearing, answering questions appropriately, and having a non-depressed affect.  There is a note that [Plaintiff] is unlikely to be able to work consistently given the severity of symptoms.  Assuming this is [Dr. Johansen's] opinion, no weight is given to this opinion on an issue reserved to the Commissioner.

Furthermore, [Dr. Johansen's] own notes and normal objective findings do not support this opinion (Exhibit 18F/14).

Furthermore, little weight is given to [Dr. Johansen's] medical source statement at Exhibit 9F, which indicated essentially no social interaction limitation, only mild adaptation limitations, and a few extreme limitations involving attention, concentration, persistence or pace along with estimated absences in excess of five days a week along with some other limitations. . . . [Dr. Johansen] apparently had advised [Plaintiff] to get a job at the September 2015 visit, but then claimed significant work related limitations back to August of 2011, which is inconsistent. . . .

[Plaintiff] did not even see [Dr. Hackshaw] until March 4, 2015, which was well after [Plaintiff's] date last insured and exams during the period up to the date last insured contain rare complaints and normal objective findings. . . . While the medical source statement of this doctor at Exhibit 12F dated July 28, 2016 indicates that the limitations do apply back to August 1, 2011, [Plaintiff] did not even see Dr. Hackshaw for treatment until March 4, 2015, and the doctor would not be able to opine on limitations preceding his treatment, nor do his records support such limitations. Notably, [Plaintiff's] treatment records back to that date do not support the limitations suggested by [Dr. Hackshaw]. . . . [Dr. Hackshaw] noted some mild to moderate (per the form's definitions) with regard to sustained concentration and pace, and none of the extreme limitations as indicated by Dr. Johansen. . . . Furthermore, [Dr. Hackshaw] was not treating [Plaintiff] until March of 2015, and would be unable to opine as to [Plaintiff's] abilities and limitations physically and mentally prior to his treatment. The normal findings in [Dr. Hackshaw's] treatment notes do not support the indicated limitations in the opinion. They are given only a little weight to the extent that [Plaintiff's] residual functional capacity has been dropped down to the medium exertional level consistent with the 50-pound lifting ability indicated.

. . .

The State agency medical consultants suggested [Plaintiff] retained the ability to maintain attention and concentration for two hour periods in a setting of short cycle tasks with at most moderate pace demands and routine workplace changes with major changes explained and introduced gradually. Some weight is given to this opinion evidence, however; other evidence in the record including the opinion evidence of the medical expert is given weight as supporting some additional limitations. As previously noted, Dr. Buban, the medical expert, who had the benefit of most of the record . . . opined that [Plaintiff] was capable of simple routine repetitive tasks without a lot of changes and only occasional interaction with the public with no teamwork required. She notably reviewed his treatment records and considered other opinion evidence in the record. She accepted most of the limitation[s] suggested by the State agency psychological consultants but also included some social interaction limitations with no tandem tasks and only

occasional public interaction. She rephrased and/or clarified some of the limitations finding [Plaintiff] limited to simple routine repetitive tasks without a lot of changes in the workplace. The undersigned gives more weight to the opinion of the medical expert as the record as a whole does support some social functioning limitations. However, the undersigned clarifies the limitation regard[ing] changes to vocationally relevant terms with [Plaintiff] limited to only occasional changes in the workplace. Due to a combination of [Plaintiff's] impairments, he is limited to simple routine tasks with no fast production pace and no tandem tasks, occasional public interaction, and occasional changes in the workplace. The undersigned has considered all the objective evidence with many mild to normal mental status exam findings, evidence of improvement with treatment, and large gaps in treatment, as well as all the opinion evidence, and finds that [Plaintiff's] mental residual functional capacity best reflects the record as a whole with no further limitation supported.

(R. at 23, 25–26, 28–29, 32.)

In support of this contention of error, Plaintiff cites only to *Schalk v. Comm'r of Soc. Sec.*, No. 10-13894, 2011 WL 4406824, at *11 (E.D. Mich. August 30, 2011), *report and recommendation adopted*, No. 10-13894, 2011 WL 4406332 (E.D. Mich. Sept. 22, 2011). (ECF No. 9, at pg. 11.) Plaintiff cites to this case in support of the assertion that "[w]hile, 'there is no bright-line rule' as to how an ALJ should incorporate moderate concentration, persistence, and pace limitations into her hypothetical questions to the vocational expert and, ultimately, the RFC, the Court does require that the RFC be supported by substantial evidence[.]" (*Id.*) However, that is not precisely what *Schalk* holds.

Instead, the court in *Schalk* found that "there is no bright-line rule requiring remand whenever an ALJ's hypothetical includes a limitation of 'unskilled work' but excludes a moderate limitation in concentration. Rather, this Court must look at the record as a whole and determine if substantial evidence supports the ALJ's RFC." 2011 WL 4406824, at *11. In the instant case, the ALJ's RFC determination did not include a limitation of unskilled work. (R. at 19.) It did, however, include a limitation to "simple, routine, repetitive tasks[.]" (*Id.*) While "[t]here may be cases where such moderate limitations preclude the performance of even some

24

simple, unskilled tasks[, plaintiff does not] explain why the facts of this particular case require a more detailed hypothetical question to adequately account for his own moderate limitations in concentration, persistence, or pace." *Lewicki v. Comm'r of Soc. Sec.*, No. 09-11844, 2010 WL 3905375, at *3 (E.D. Mich. Sept. 30, 2010). Plaintiff in the instant case also fails to explain why the facts of his case require a more detailed hypothetical question. Rather, Plaintiff simply points to evidence in the record that he believes demonstrates his limitations in concentration, persistence, and pace. (ECF No. 9, at pg. 9–12.)

Here, the ALJ properly evaluated the record and provided sufficient explanation based on substantial evidence. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) ("If substantial evidence supports the commissioner's decision, this Court will defer to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion."). Accordingly, the Undersigned finds that, reviewing the record as a whole, substantial evidence demonstrates that the ALJ's RFC adequately accounted for all of the limitations he found credible. It is therefore **RECOMMENDED** that Plaintiff's contention of error based on the ALJ's RFC determination be **OVERRULED**.

### B. Fibromyalgia

The United States Court of Appeals for the Sixth Circuit has explained that fibromyalgia "causes severe musculoskeletal pain which is accompanied by stiffness and fatigue due to sleep disturbances." *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 817 (6th Cir. 1988). Further, Social Security Rule 12-2p, which provides guidance on how the agency both develops "evidence to establish that a person has a medically determinable impairment of fibromyalgia" and evaluates fibromyalgia in disability claims, describes fibromyalgia as "a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby

soft tissues that has persisted for at least 3 months."  SSR 12–2p, 2012 WL 3017612, at *2 (July 25, 2012).

SSR 12-2p "provides guidance on how we develop evidence to establish that a person has a medically determinable impairment of fibromyalgia, and how we evaluate fibromyalgia in disability claims . . . ."  *Id.* at *1.  A claimant has fibromyalgia if:  (1) there exists a history of widespread pain (in all quadrants of the body) that has persisted for at least three months (the pain "may fluctuate in intensity and may not always be present"); (2) at least eleven of eighteen possible positive tender points are found on physical examination; and (3) evidence exists "that other disorders that could cause the symptoms or signs were excluded" as the possible source of pain.  *Id.* at *2–3.  While a licensed physician is the only acceptable medical source who can provide evidence of fibromyalgia, "[w]e cannot rely upon the physician's diagnosis alone."  *Id.* at *2.  Fibromyalgia "should be analyzed under the traditional five-step evaluation process used for analyzing other claims for SSI."  *Luukkonen v. Comm'r of Soc. Sec.*, 653 F. App'x 393, 399 (6th Cir. 2016) (citing SSR 12-2p).  SSR 12-2p instructs that fibromyalgia is not a listed impairment and, therefore, at step three "we determine whether [fibromyalgia] medically equals a listing (for example, listing 14.09D in the listing for inflammatory arthritis), or whether it medically equals a listing in combination with at least one other medically determinable impairment."  SSR 12-2p, 2012 WL 3104869, at *6.

Here, the ALJ found that Plaintiff's fibromyalgia was a severe impairment, but that it did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 18–19.)  Specifically, the ALJ considered Plaintiff's fibromyalgia as follows:

> The undersigned has considered the claimant's fibromyalgia in accordance with SSR 12-2p and has determined it does not medically equal a listing, such as Listing 14.09, whether singularly or in combination with at least one other medically determinable impairment.

(R. at 19.)  Plaintiff asserts that the ALJ has made a "biased, lay determination as to the limitations caused by the combination of the claimant's impairments" and that the ALJ's RFC determination "failed to include appropriate accommodations for frequent pain, fatigue, or loss of concentration due to pain and medication."  (R. at 14.)

The United States Court of Appeals for the Sixth Circuit has declined to require more than "minimal reasoning at step three."  *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 365 (6th Cir. 2014).  Furthermore, at step three, the regulations require only that the ALJ consider "the medical severity of your impairment(s)," rather than the stricter "good reasons" requirement that governs evaluation of treating source opinions.  *Id.*; *see* § 404.1520(a)(4)(iii).  Here, besides the note regarding Plaintiff's fibromyalgia at step three, the ALJ thorough discussed Plaintiff's fibromyalgia and its symptoms at step four.  (R. at 22–28.)

Plaintiff nevertheless insists that the "record is replete with evidence that satisfies the requirements of SSR 12-2p."  (ECF No. 9, at pg. 13 (failing, however, to cite to pages in the record for this assertion).)  While some of the record may support a diagnosis of fibromyalgia, which the ALJ credited as a severe impairment, the evidence does not undermine the ALJ's severity analysis at step three.  For example, even though Plaintiff testified at the administrative hearing that his fibromyalgia symptoms made it difficult to perform his job duties prior to being laid off in 2008, he spent the next three years doing extensive home renovation work, as well as other physical activities.  (*See, e.g.*, R. at 122, 162, 364, 392, 395, 537, 673, 680, 689, 700, 707, 713.)  Furthermore, although Plaintiff testified that his fibromyalgia symptoms contributed to problems with performing his job duties in 2008, he did not seek treatment for fibromyalgia until January 2015, after his date last insured.  (R. at 122, 529 (doctor's appointment on January 9,

2015 where Plaintiff was diagnosed with fibromyalgia); *see also, e.g.*, R. at 666 (reporting no symptoms associated with fibromyalgia at appointment on July 18, 2012).)

Notably, "a diagnosis of fibromyalgia does not equate to a finding of disability or an entitlement to benefits." *Stankoski v. Astrue*, 532 F. App'x 614, 619 (6th Cir. 2013) (citing *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir. 2008)); *see also Kutscher v. Comm'r of Soc. Sec.*, No. 1:13-cv-1389, 2014 WL 3895220, at *13 (N.D. Ohio Aug. 8, 2014) ("However, the mere diagnosis of an impairment says nothing about the severity of that impairment.") (citing *Foster v. Bowen*, 853 F.2d 483, 489 (6th Cir. 1988)). In short, evidence that Plaintiff had fibromyalgia does not establish that this condition met or medically equaled a listed impairment at step three. *See Thacker v. Social Sec. Admin.*, 93 F. App'x 725, 727–28 (6th Cir. 2004) ("At step three of the evaluation process, it is the burden of the claimant to show that he meets or equals the listed impairment."); *cf. Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (2009) ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'") (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Plaintiff's assertion that the ALJ's RFC determination "failed to include appropriate accommodations for frequent pain, fatigue, or loss of concentration due to pain and medication" also falls short. (*See* ECF No. 9, at pg. 14.) Plaintiff fails to develop his argument regarding the RFC determination beyond this vague statement and has therefore waived it. *See Dillery v. City of Sandusky*, 398 F.3d 562, 569 (6th Cir. 2005), *abrogated on other grounds as recognized by Anderson v. City of Blue Ash*, 798 F.3d 338, 357 n.1 (6th Cir. 2015) ("It is well-established that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (internal quotation marks and citations omitted). It is

therefore **RECOMMENDED** that Plaintiff's contention of error based on the ALJ's analysis of his fibromyalgia be **OVERRULED**.

### C. Personality Disorder

Plaintiff's final challenge to the ALJ's decision is that the ALJ "failed to recognize and thus consider [Plaintiff's] personality disorder as a medically determinable impairment." (ECF No. 9, at pg. 17.) The ALJ is required to consider all objective medical evidence in the record where such evidence is produced by an acceptable medical source. 20 C.F.R. § 404.1512(b); 20 C.F.R. § 404.1513; *Minor v. Comm'r of Soc. Sec.*, No. 12-1268, 2013 WL 264348, *16 (6th Cir. Jan. 24, 2013). In addition, in formulating a RFC, the ALJ is required to consider "all the relevant medical and other evidence in [the] case record," including evidence of impairments that are not considered to be "severe" at step two of the sequential evaluation process. 20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545(a); *see also Nejat v. Comm'r of Soc. Sec.*, 359 Fed. App'x 574, 577 (6th Cir. 2009) (quoting Soc. Sec. Rul. 96-8p, 1996 WL 374184 at *5 (1996)) ("After an ALJ makes a finding of severity as to even one impairment, the ALJ 'must consider limitations and restrictions imposed by *all* of an individual's impairments, even those that are not 'severe.'") (emphasis in original). A failure of the ALJ to consider all of a claimant's records or symptoms in developing an RFC generally constitutes reversible error. *Cf. Malone v. Comm'r of Soc. Sec.*, 507 Fed. App'x 470, 472 (6th Cir. 2012) (finding no reversible error in the RFC determination "because the ALJ considered all of the symptoms that were consistent with the medical evidence in determining his residual functional capacity"); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (concluding that reversal is required where the agency fails to follow its own procedural regulations where the regulation is intended to protect claimants). Further, "[i]t is an elemental principle of administrative law that agencies are bound

to follow their own regulations." *Wilson*, 378 F.3d at 545. Even if the aggrieved party appears to have little chance of success on the merits, courts generally will not find the procedural error to be harmless. *Id.* at 546. "To hold otherwise . . . would afford the Commissioner the ability to violate the regulations with impunity and render the protections promised therein illusory." *Id.*

As discussed above, the evidence in the record regarding Plaintiff's personality disorder comes from Dr. Sansotta. (R. at 552–54, 557–59.) The ALJ did not mention any evidence regarding a personality disorder at step two, nor did he find that Plaintiff had the severe impairment of a personality disorder. (*See* R. at 18–19.) However, the ALJ did discuss personality disorder in the context of discussing Dr. Sansotta's opinions later in the decision. (R. at 31–32.) Plaintiff contends that the ALJ's failure to classify his personality disorder as severe or non-severe means that it is not a medically determinable impairment, and that if it was not a medically determinable impairment, it received no consideration in the development of the RFC. (ECF No. 9, at pg. 17.)

At step two of the sequential evaluation, a plaintiff must show that he suffers from a "severe impairment" in order to warrant a finding of disability. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). A "severe impairment" is defined as an impairment or combination of impairments "which significantly limits your physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c) and 416.920(c). "Upon determining that a claimant has one severe impairment the ALJ must continue with the remaining steps in the disability evaluation." *Hobbs v. Comm'r of Soc. Sec.*, No. 1:14-cv-121, 2015 WL 4247160, at *5 (W.D. Mich. July 13, 2015) (citing *Maziarz v. Secretary of Health & Human Services,* 837 F.2d 240, 244 (6th Cir. 1987)). "Once the ALJ determines that a claimant suffers from a severe impairment, the fact that the ALJ failed to classify a separate condition as a severe impairment

does not constitute reversible error." *Hobbs*, 2015 WL 4247160 at *5 (citing *Maziarz,* 837 F.2d at 244). An ALJ can consider non-severe impairments in determining the RFC. *Id.* "The fact that some of [the claimant's] impairments were not deemed to be severe at step two is therefore legally irrelevant." *Anthony v. Astrue,* 266 F. App'x 451, 457 (6th Cir. 2008). Here, the ALJ found that plaintiff had severe impairments of fibromyalgia, obstructive sleep apnea with hypersomnia, and affective and anxiety disorders. (R. at 18.) The ALJ's failure to include personality disorder as an additional severe impairment at step two is legally irrelevant. *Anthony,* 266 F. App'x at 457.

The ALJ did not include personality disorder as a non-severe medically determinable impairment which could be considered in determining Plaintiff's RFC. *See Maziarz,* 837 F.2d at 244; 20 C.F.R. §§ 404.1545(a)(2) and 416.945(a)(2) ("We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not "severe," . . . when we assess your residual functional capacity."). Regarding Dr. Sansotta's opinion on personality disorders, the ALJ noted that she completed the medical source questionnaire "nearly four years after the end of treatment." (R. at 31, 552–54, 557–59.) Furthermore, as Dr. Buban, the medical expert, noted in her testimony, the questionnaire had cross outs and handwritten statements indicating the inability to comment and that it was "per patient report." (R. at 31, 137, 552–54, 557–59.) No other medical expert in the record indicated that Plaintiff suffered from a personality disorder or diagnosed Plaintiff with a personality disorder. Accordingly, there is no evidence that Plaintiff had a medically determinable impairment of personality disorder between his alleged onset date and his date last insured.

To the extent the ALJ has erred, the error is harmless.  Even if the Court remanded the case and the ALJ resolved this issue in Plaintiff's favor by finding that personality disorder was medically determinable but non-severe impairment,

> which is the best result Plaintiff could hope for were the case to be remanded—the key question would then be "whether the ALJ's decision not to find any limitations arising from the condition in question is supported by substantial evidence." *See Rose v. Comm'r of Soc. Sec.*, 2015 WL 6735313, at *5 (S.D. Ohio Nov. 4, 2015), *adopted and affirmed*, 2015 WL 7779300 (S.D. Ohio Dec. 2, 2015).  Where, as here, Plaintiff identifies no such limitations, and it is not apparent that any exist, the error made by the ALJ is harmless.  It would certainly be better practice were an ALJ to say explicitly which impairments are found to be non-severe and which are found not to be medically determinable, but ordering a remand for clarification of that question when the ALJ's residual functional capacity finding would not change would be an exercise in futility.

*Rouse v. Comm'r of Soc. Sec.*, No. 2:15-cv-0223, 2017 WL 163384, at *4–5 (S.D. Ohio Jan. 17, 2017), *report and recommendation adopted*, No. 2:16-cv-0223, 2017 WL 1102684 (S.D. Ohio March 24, 2017) (finding that even though error had occurred it did not justify a remand).   It is therefore **RECOMMENDED** that Plaintiff's contention of error based on the ALJ not deeming personality disorder as a medically determinable impairment for Plaintiff be **OVERRULED**.

## VII. CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits.  Accordingly, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## <u>PROCEDURE ON OBJECTIONS</u>

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in

question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

Response to objections must be filed within fourteen (14) days after being served with a copy.

Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and

Recommendation will result in a waiver of the right to *de novo* review by the District Judge and

waiver of the right to appeal the judgment of the District Court.  *See, e.g.*, *Pfahler v. Nat'l Latex

Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate

judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district

court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that

defendant waived appeal of district court's denial of pretrial motion by failing to timely object to

magistrate judge's report and recommendation).  Even when timely objections are filed,

appellate review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d

981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to

specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation

omitted)).


Date: July 31, 2019                                      */s/ Elizabeth A. Preston Deavers*_____
                                                         **ELIZABETH A. PRESTON DEAVERS**
                                                         **CHIEF UNITED STATES MAGISTRATE JUDGE**